## Southern Savings & Building Association v. Gray et ux.

(Decided March 16, 1934.)

430

EWING L. HARDY, MARSHALL B. HARDY, SELLIGMAN, SELLIGMAN & GOLDSMITH for appellant.
LAWRENCE F. SPECKMAN for appellees.

OPINION OF THE COURT BY HOBSON, COMMISSIONER—Reversing.

Emmett L. Gray and wife, Geneva Gray, brought this action in equity against the Southern Savings & Building Association on March 12, 1931, alleging that on September 16, 1930, they were solicited to purchase certain shares of stock of the defendant and it was represented to them that they could purchase 5 shares of paid-up stock, which would pay them dividends of not less than 7 per cent., and that, believing this to be true, they paid the defendant $550 for the stock, that the representations were false and fraudulent, and that the defendants had refused to repay the money. They prayed judgment therefor. Various motions were made by the defendant, and on June 22, 1931, the plaintiffs filed an amended and substituted petition in two paragraphs. On motion of the defendant it was required to elect which paragraph it would sue upon and elected to sue upon the second paragraph, which alleged false representations with intent to deceive and fraud in obtaining the money. They alleged that the agent represented to them that they could purchase paid-up stock at $100

a share and in addition subscribe for 100 shares of $100 each of installment or deferred payment stock, upon which they could pay any sum of money, at any time, just as deposits are made in savings banks, and they would receive dividends of not less than 7 per cent. thereon annually, payable in January and July of each year and could withdraw the paid-up stock or deferred payments at any time; that, relying on these representations and believing them to be true, they paid to the defendant, on September 16, 1930, the sum of $550, of which sum $500 was to pay for 5 shares of paid-up stock and $50 as a deposit on a subscription for 100 shares of installment stock.

The allegations of the petition were denied by answer, proof was taken, and on final hearing the court entered judgment for the plaintiffs. The defendant appeals.

The entire transaction between the plaintiffs and the defendant, in which the contract was made and the money was paid, was transacted by them with C. F. Edson, who died in January, 1931. The only witness introduced by the plaintiffs to prove the contract made with the defendant was the plaintiff E. L. Gray. The agent with whom he made the contract being dead, the court properly, under section 606 of the Civil Code of Practice, sustained the exceptions to all his testimony as to what took place between him and Edson. The written application, dated September 16, 1930, and signed by the plaintiffs, is in these words:

"1. I desire to become a member of the Southern Savings and Building Association in accordance with the terms and conditions appearing hereon, and I further agree to be bound by the rules, regulations and By-laws of said Association.

"2. I hereby subscribe 100 shares of the capital stock of this Association and agree to pay therefor the par value of said stock of $100.00 per share, together with $5.00 per share [cash] which shall be disbursed by the proper officers as provided by the by-laws. I further agree to pay for said stock in installments of not less than $0.50 per month on each share herein subscribed for, or by cash in full at my option.

"3. I understand that my initial payment of

$5.00 per share is not a part of the withdrawal value of the stock subscribed for and that no dividends are paid on same. This amount is withdrawable from surplus only as set forth under the terms of the surplus certificate issued through this subscription.

"4. This subscription together with the By-laws constitute a contract between the member and the Association.

"5. No person has the authority to change or alter the terms of this subscription or bind the Association to any statement not contained in the subscription."

Gray says that certain blanks in the paper were not filled when he signed it. On September 16, the company issued to the plaintiff a certificate which, so far as material, is in these words:

"Number 1325                              *100* Shares

"This is to certify that Emmett L. & Geneva Gray or survivor of either has subscribed for One Hundred shares of the full participating Capital Stock of the Southern Savings and Building Association, and has paid the Association, in accordance with and for the purposes set forth in the by-laws of said Association, the sum of $500.00.

"The legal holder of this Surplus Certificate, at such time as his proportionate share in the Surplus Fund of the Association, as defined in the by-laws, shall be equal to the amount represented hereby, shall, upon the surrender of this certificate, be entitled (1) to have the amount represented hereby credited on his pass book, or (2) to convert same into an equal amount of any class of stock at such time being issued by the Association, or (3) to withdraw the amount represented hereby in accordance with the provisions of the by-laws.

"The amount represented herein is not a part of the withdrawal value of the stock.

"The certificate is transferable in accordance with the rules and regulations of this Association."

This paper was received by them on September 18, and Gray says he looked at it and did not like it as a

statement of the contract. Thus things stood until in January, 1931, when Gray went down, as he says, to get a dividend, and for the first time learned how the contract had been drawn up. The passbook which was delivered with the above certificate had these entries in it:

"No. 1325. Name: Emmett L. & Geneva Gray, or survivor of either. Street, 108 So. Jane St., City of Louisville, Ky. Number of Shares, 100. Par Value $100.00.

| Year | Date | Initials | Withdrawals | Deposits | Bal. |
|------|------|----------|-------------|----------|------|
| 1930 | Sept. 16. | J. S. | | $50- | 50."|

Gray says he did not open the passbook or read it. The only other testimony by the plaintiff E. L. Gray as to misrepresentations in obtaining the contract is his statement that in January, 1931, he went to see Mr. Stricklin, who was manager of the stock sales, and Stricklin, when he had told him his story, said:

"I believe what you tell me to be the truth and a lot of these salesmen have misrepresented this stock and we fired them. I can not give you your money back right now but as soon as we sell $500.00 worth of stock I will give you your money back; I will phone you in a very short time."

Stricklin was not introduced to contradict this. Gray also testified that he knew two of the directors, Mr. Stokes and Mr. Bonte, and when he told Mr. Bonte his story he said,

"Why hell they can't keep your money, go up there and demand it and if they don't give it to you get a lawyer and make them give it to you."

He also said that Mr. Stokes said that he would have the matter taken up at the next meeting of the direcors, but that he heard nothing further from him.

As Edson is dead, all the testimony of Gray as to what took place between him and Edson must be disregarded. His testimony that the blanks were in the contract when he signed it and all he testified that Edson then said is incompetent. Among other things he said Edson then gave him the prospectus which he filed with his testimony and this prospectus is relied on by appellee here. But his is the only testimony in the case as to the prospectus, and without it there is no proof that the prospectus was known to him or had any part in the

transaction; when Gray's testimony as to what Edson did and said in securing the contract is not considered, there is no evidence left showing any misrepresentation by Edson or fraud in the transaction.

The building association was organized in June, 1929, and in June, 1929, it made a written contract with E. E. Stricklin and W. J. Hullett which contained these provisions as to the sale of the stock:

"2nd. The fiscal agents agree to give their time to the sale of the stock of the Association, until all of the present authorized capital stock of the Association shall have been fully sold, the sales price of said stock to be $105.00 per share.

"3rd. The Association agrees to allow the said fiscal agents for their services the sum of $5.00 per share of the shares of capital stock sold by them under this agreement, said amount to be paid in cash as sales are made.

"4th. It is agreed that out of the above allowance of $5.00 per share the fiscal agents are to pay the stock salesmen, office rent, stenographers, advertising and all other expenses connected with the marketing of said stock, together with all other expenses in connection with the organization and operation of the Association, during the life of this contract, and pay for and install all necessary furniture, fixtures, and operating equipment which are to be approved by the Association, title to which shall belong to the Association."

There is proof that Stricklin and Hullett took an active part in organizing the association and so got the contract with it, but the proof goes no further. So far as shown by the proof E. E. Stricklin had no other connection with the building association. It does not appear that he was an officer in the association or had any power to bind it in any way in January, 1931, except under his contract. His statement made in January, 1931, may have been an admission binding on him personally, but it bound the company in no way, in the absence of proof that he was then an officer with power to act for it in the matter. He knew nothing personally of the transaction.

The board of directors may bind the corporation by its action as such, but mere talk by one or more direc-

tors, acting separately and without any action by the board, is without any legal effect as to the association.

The evidence therefore as to what E. E. Stricklin said to Gray in January, 1931, and what two of the directors said to him, was incompetent against the building association, and should have been excluded. When this is done we have left in the case, only the written contract between the parties above quoted.

The association was originally capitalized at $2,500,000, but as the stock was sold this was increased to $5,000,000. Of this $3,900,900 had been sold in January, 1932. Stricklin and Hullett worked under the contract until December, 1930; the contract with them was then revoked. The association after this sold the stock. Stricklin and Hullett had sold before the contract was revoked 37,000 shares of par value $3,700,000, and received for their services $184,257.60, out of which, as shown by the statement filed, they retained $25,731.86, after paying expenses, as specified in the contract, of $158,525.74.

It is earnestly insisted that the expense account is padded and that the amount Stricklin and Hullett really received was much greater than admitted, and that upon a proper settlement it would appear that a great injustice was done the company. But if this is true it does not appear that this had anything to do with Gray's contract; for he had no talk with any officer of the company. All the talk he had about the matter was with Edson, and Edson is dead, and he cannot testify to anything that Edson told him. There is no legal evidence in the case that Gray sought any information on this subject from anybody. He simply made the subscription on the talk he had with Edson, and there was in fact no misrepresentation to him as to this contract. He cannot have relief, therefore, here on the ground that this contract was one the company should never have made or that the contract was not properly carried out, for this matter had nothing to do with his making the subscription. If he acted on what Edson told him, it was simply his misfortune that he cannot testify to these facts after Edson is dead.

Gray was an engineer of nineteen years' experience. He made the contract, signed the papers, and the association acted upon them and issued him the stock. Written contracts are not lightly set aside. The officer of the

company, who issued the certificate to him acted in good faith and knew nothing of the objections now made until January, 1931. In United Talking Machine Co. v. Metcalf, 164 Ky. 260, 175 S. W. 357, 358, where there was a defense to a written contract on grounds similar to those presented here, the court thus stated the rule:

> "It is a rule in this state that a party who can read and has an opportunity to read the contract which he signs must stand by the words of his contract, unless he is misled as to the nature of the writing which he signs or his signature is obtained by fraud. Western Mfg. Co. v. Cotton & Long, 126 Ky. 749, 104 S. W. 758, 31 Ky. Law Rep. 1130, 12 L. R. A. [N. S.] 427; Blake v. Black Bear Coal Co., 145 Ky. 788, 141 S. W. 403; Case Mill Mfg. Co. v. Vickers, 147 Ky. 396, 144 S. W. 76; J. I. Case Threshing Machine Co. v. Mattingly, 142 Ky. 583, 134 S. W. 1131. To sustain the charge that a party's signature was obtained by misrepresentation, it must appear that the misrepresentation was material; that it was relied upon by the person whose action was intended to be influenced, and that it was made with knowledge of its falsity, or under circumstances which did not justify belief in its truth."

To same effect, see United Talking Machine Co. v. Metcalf, 174 Ky. 132, 191 S. W. 881; Draeger v. Kent County Savings Assoc., 242 Mich. 486, 219 N. W. 637; McCormack v. Molburg, 43 Iowa, 561.

> "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission." Upton v. Tribilcock, 91 U. S. 45, 50, 23 L. Ed. 203.

This rule has been often applied by this court and is conclusive of appellees' right to maintain this action. In addition to this the appellees had at least full notice of the contract as drawn and signed by them when the next day they received the certificate and passbook. It was incumbent on them to speak then, and when they, at the least, accepted the contract, then they cannot now

be heard to complain that the contract was not as it was made by them.

Judgment reversed, and cause remanded for a judgment dismissing the petition.