## Redford v. Thompson's Administrator.
(Decided May 21, 1935.)

R. W. KEENON for appellant.

E. V. PURYEAR for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—Affirming.

Some time prior to April 6, 1933, the estate of John B. Thompson, deceased, recovered judgment against Mrs. Georgia Redford and her nephew, H. Stites Milton, for the sum of $134,756.70, and for the return of two Liberty bonds, and defendants prosecuted an appeal to this court. Since the judgment was not superseded, the administrator caused an execution to issue which was levied upon certain real and personal property of defendants. The sum of $70,000 was realized from a sale of the property levied upon.

Subsequently, but before April 6, 1933, the administrator filed suit against Georgia Redford, C. E. Rankin, and Hanly Bohon, seeking to recover $1,431.40 upon a bond executed in this action and a suit against C. D. Rankin, I. C. James, and Georgia Redford to recover the sum of $10,000 which it was alleged had been paid to them as preferential fees, and also a suit against Georgia Redford and H. Stites Milton for the discovery of any property owned by them which might be subjected to the satisfaction of the balance due the estate on the judgment theretofore recovered. Mrs. Redford had asserted a claim against the estate for services rendered to decedent.

On April 6, 1933, H. Stites Milton, Georgia Redford, and T. W. Latta, administrator of J. B. Thompson, entered into an agreement in the original action whereby, after reciting the foregoing facts and stating that Georgia Redford was asserting a claim against the estate of J. B. Thompson consisting of notes, homestead exemption, claims for services, and possibly other claims not theretofore mentioned by her, it was provided:

"That the defendants, Georgia Redford and H. Stites Milton will immediately dismiss their appeal from the said judgment now pending in the Court of Appeals of Kentucky, said dismissal to be at their cost, and that the defendants waive and relinquish any and all claims of every kind and character, which they now have, or claim to have, against the estate of John B. Thompson, and the said Redford agrees to waive and relinquish all her claims growing out of said notes, said alleged services, her homestead exemption, and all other possible claims against said estate.

538

"The plaintiffs agree and hereby covenant that in consideration of the above no further effort shall be made by them against the said Redford and Milton and Mary M. Milton to subject property to make collection of said deficiency judgment against the said Redford and Miltons by undertaking claims or suits against them in an effort to set aside payments to their attorneys showing preference to them, or otherwise, and said plaintiffs agree that the suits now pending against Georgia Redford, E. C. Rankin and Hanly Bohon to recover $1431.41 upon a bond given in consideration of this litigation, and a suit against C. E. Rankin, I. C. James and Georgia Redford to recover the sum of $10,000., which it is alleged was paid to them as preferential fees, shall be dismissed; all matters and things complained of in said suits are hereby forever settled and closed.

"It is expressly provided that the plaintiffs reserve the full right to proceed against the Citizens Union National Bank and J. J. B. Hilliard & Son to recover from them or either of them the deficiency judgment of approximately $85,000.00.

"Witness this April 6th 1933

"H. Stites Milton

"Georgia J. Redford

"T. W. Latta,

"Adm'r for John B. Thompson."

On October 20, 1933, Georgia Redford instituted this action against Walter Latta, administrator of John B. Thompson, deceased, seeking to recover $100,000 for services rendered decedent, and to recover on two notes of $1,000 each which it was alleged the decedent had executed and delivered to her, and which had not been paid. It was alleged that proof of these claims had been properly made and presented to the administrator, but that payment had been refused and the verified claims were filed with and made a part of the petition.

By answer, counterclaim, and set-off, defendant denied the material allegations of the petition and interposed a plea of limitation as to all of plaintiff's claim for services, except the sum of $5,000, and alleged that as to the $95,000 thereof, more than 5 years had elapsed

since her cause of action, if any, accrued. In a second paragraph, he pleaded and relied on the agreement entered into in the original action as hereinbefore set out in bar and abatement of the cause of action alleged in the petition. In a fourth paragraph it was alleged that in the event the settlement relied on in the third paragraph should be set aside, then, and in that event, plaintiff was justly indebted to the estate in the sum of $64,-756.70, the balance due on the judgment in the original action with interest, and that such sum or so much thereof as might be necessary should be applied as a set-off against any amount recovered by plaintiff. In a fifth paragraph it was alleged that John B. Thompson before his death paid plaintiff for all services rendered and to be rendered him during his lifetime, and that she accepted such payment in full accord and satisfaction of all claims against him.

By reply as amended, plaintiff traversed the plea of limitation and entered a general denial to the other affirmative defenses set up in the answer. She admitted that she signed the agreement referred to in the answer, but alleged, in substance, that it only purported to be a settlement of the suits referred to therein, and in no way affected her rights or any claim she had against the estate for services rendered decedent or on the notes executed by decedent to her; that her signature to the contract was procured by fraud and misrepresentation as to its contents and by mistake upon her part as to its real meaning; that at the time she signed the contract she had been ill and had been harassed and annoyed by suits and the efforts of defendant made for the purpose of inducing her to sign the purported agreement; that as a result of such illness, and persuasion, threats, duress, and her physical condition and a mistake on her part, and fraud and misrepresentation upon the part of defendant, she was unaware of the true import of the contract and did not realize the effect thereof when she signed it; that by reason of such mistake upon her part and the fraud and misrepresentation upon the part of defendant, the contract did not contain terms and stipulations agreed upon by the parties at the time, and that the contract should be reformed so as to conform to the actual intent and agreement of the parties at the time it was executed.

By rejoinder, defendant denied the affirmative alle-

gations of the reply as amended, and affirmatively alleged that the contract and settlement set up in the answer was entered into by plaintiff with the advice, consent, and approval, and in the presence of her counsel who had represented her and who were representing her in the litigation which the settlement terminated, and that the contract was negotiated and the terms thereof were agreed upon with plaintiff through her attorneys; that after entering upon the contract and after having the benefit of her counsel's advice and approval, she was estopped to rely upon the matters alleged in her reply in avoidance thereof. A traverse of the affirmative allegations of this pleading completed the issue.

On final hearing it was adjudged that the petition be dismissed, and that plaintiff take nothing thereby, and she is appealing.

It is argued by counsel for appellant in effect that the evidence is sufficient to establish a mistake and misunderstanding upon the part of appellant as to the full purport and meaning of the contract which she signed and of fraud and inequitable conduct upon the part of appellee or his counsel in procuring her signature to the contract, and, in such circumstances, a reformation of the contract so as to express a true agreement of the parties is warranted, and the chancellor erred in not granting such relief.

Without entering into a history of all the litigation between the parties and the questions involved, it may be said that the evidence for appellant discloses that she had been subjected to a number of lengthy and searching cross-examinations. Considering all the litigation and the persistent efforts of the administrator and his counsel to uncover or to secure information concerning assets of the estate alleged to have been held by appellant and her nephew and her anxiety concerning the outcome of the litigation, it is not to be doubted that she was in a perturbed and nervous state. The evidence discloses that appellee was seeking to take her deposition in the action for discovery, and there is likewise evidence to indicate that she was seeking to avoid this ordeal.

Previous to the time the contract in controversy was made, there had been some discussion among coun-

sel concerning a settlement. Appellee was represented by Messrs. Galvin, Slattery, Alcorn, and Gaither, and appellant by Messrs. Rankin, Corn, and James. On the day the contract was drafted, it appears that the deposition of appellant was to be taken at Harrodsburg, and Messrs. Galvin, Slattery and Alcorn had come there to be present with Colonel Gaither, the local counsel, at the taking. They arrived in Harrodsburg in the morning, and in going to the office of Colonel Gaither, Mr. Slattery passed the office of Mr. Rankin and suggested to him that it would be to the interest of all parties concerned to effect a settlement, and at this time or later indicated as a fair basis for a settlement that the slate be wiped clean, and that each party waive all further claims against the other. Mr. Rankin told him that he would take the matter up with his client, which he did, and made a skeleton or tentative draft of ideas embodied in their discussion and took it to the office of Colonel Gaither, where counsel for appellee were assembled. Objections were made to some of the provisions, and suggestions as to how the contract might be clarified and made more specific in other particulars, and it was carried back and forth between the offices of counsel for respective parties until it was finally drafted and agreed upon as it appears in the record. Practically the entire day was consumed in the negotiations. Appellant testified that she did not read the contract nor was it read in her presence; that counsel for appellee were insisting that she sign the contract and thus relieve herself of all the annoyances and anxiety, and that they threatened to proceed with the taking of the deposition if she did not sign it. It does appear that in the afternoon, Colonel Gaither became impatient and indicated to his associates that appellant was merely playing with them and not trying to effect a settlement, and he went to the office of Mr. Rankin and notified him that they would proceed with the deposition. Mr. Rankin reassured him and later went to his office and reported that Mr. Milton had signed the contract, and that he thought appellant would sign it. He again returned and reported that appellant had taken a pen to sign the contract, but then decided she would not do so unless she was paid the sum of $1,000. There is some conflict in evidence as to whether this sum demanded by her was to cover her homestead right in property which had been sold, or whether it was to pay costs of

the suit pending in the Court of Appeals. When this information was communicated to appellee and his counsel, he flatly refused to pay this sum, and in fact his evidence as well as that of his counsel indicates that he doubted the wisdom of making the settlement which had been agreed upon. It was then time for Messrs. Galvin and Slattery to catch their train for Cincinnati, and the conference broke up without the contract being signed by appellant. Between this and the 12th day of April, on which date the contract was signed by appellant, further communication passed between Mr. Slattery and Mr. Rankin concerning the settlement. After leaving Harrodsburg, Messrs. Slattery, Galvin, and Alcorn agreed to pay the $1,000 to appellant out of the fees to be received by them, and this information was communicated to Mr. Rankin, and by agreement the parties met in Harrodsburg on the 12th to consummate the matter. In some way the amount to be paid appellant was increased to $1,020; the evidence being that the additional $20 was to cover some court costs. It was finally agreed that Mr. Galvin would give appellant his check for $1,020, but on returning from lunch he learned that Colonel Gaither was preparing to attach this sum to pay some fees or costs that appellant owed a stenographer. Mr. Galvin suggested that this would not be dealing fairly with appellant, and it was agreed that he should go to Mr. Rankin's office and talk with him and his client concerning the matter. He testified that he did go and talk with him, and it was agreed that he make two checks, one for $100 and the other for $920, which he did. The $100 check was indorsed and delivered to the stenographer in payment of her bill and the other check was retained by appellant. Appellee and each of his attorneys except Colonel Gaither testified that they had no communication with appellant concerning the agreement and used no coercion to procure her signature to the contract. Mr. Rankin testified that the contract as finally drafted and signed by appellant was read a number of times in her presence, and there was nothing to indicate that her mental and physical condition was such that she was not capable of understanding it; that he would not have permitted her to have entered into a contract if he had thought otherwise; that the terms of the contract were fully discussed by attorneys for appellant in the presence of her nephew, and the nephew stated to counsel after he had signed

the contract that he thought it was a good settlement for appellant. Objection was made to the introduction of Mr. Rankin as a witness because of the relation of attorney and client existing between him and appellant, and he protested against testifying and only replied to such questions as he was directed to answer by the court.

The only thing that held up the full execution of the contract on the day it was drafted was appellant's demand that she be paid $1,000 or $1,020 to cover costs she had incurred or for which she was liable, or to cover her claim for homestead and some costs. Between that day and the day on which she signed the contract, she made a trip to Louisville and while there consulted with a prominent attorney concerning her affairs, and testified that he advised her not to waive or surrender her claim against the estate for services. This would indicate that she knew the claim she is now asserting was involved in the contract, or at least it was sufficient to put her on her guard concerning the nature of the provisions of the contract. According to the allegations of her petition and her evidence, she must have been a woman of unusual good judgment and business capacity since she claims to have assisted decedent who had acquired a large estate in his business and personal affairs and advised him with reference to business transactions. The contract is couched in plain, simple terms, free from ambiguity and uncertainty and its purport and meaning could not be misunderstood by a person of ordinary understanding. Appellant had every opportunity to read the contract or to have it read to her, and it is a rule of general application that where a party having the ability to read and to understand the provisions of the contract signs it without reading the instrument, he cannot thereafter avoid its effect by claiming that it does not express the true agreement of the parties unless his signature was procured by actual or constructive fraud. Morgan v. Mengel Co., 195 Ky. 545, 242 S. W. 860; Southern Savings & Banking Association v. Gray, 253 Ky. 429, 69 S. W. (2d) 738; Metropolitan Life Insurance Co. v. Trunick's Adm'r, 246 Ky. 240, 54 S. W. (2d) 917; Brown v. Union Central Life Ins. Co., 241 Ky. 514, 44 S. W. (2d) 514; Pickrell & Craig Co. v. Bollinger-Babbage Co., 204 Ky. 314, 264 S. W. 737.

Generally speaking, a contract will not be set aside

or reformed because of mistake, unless it is made to appear that the mistake was mutual. Sheeran v. Irvin, 230 Ky. 307, 19 S. W. (2d) 976. It is apparent in this instance that there was no mutual mistake, and to authorize a reformation of the contract it was necessary for appellant to establish mistake upon her part and fraud, either actual or constructive, upon the part of appellee in procuring her signature to the contract.

To authorize the modification or reformation of a contract on the ground of mistake or fraud, the proof to establish such mistake or fraud must be full, clear, and convincing. Insurance Company of North America v. Evans, 229 Ky. 613, 17 S. W. (2d) 711; Johnson & Phillips v. McClard, 231 Ky. 374, 21 S. W. (2d) 478; Perry v. Thomas, 232 Ky. 781, 24 S. W. (2d) 603; Stanley v. Slone, 216 Ky. 114, 287 S. W. 360; Dotson v. Hunt, 207 Ky. 832, 270 S. W. 38; McKnight v. Johnson, 236 Ky. 763, 34 S. W. (2d) 239; Francis v. Domino, 251 Ky. 255, 64 S. W. (2d) 571. A number of cases in this jurisdiction hold that the mistake or fraud must be established beyond reasonable controversy. Gillispie v. Blanton, 214 Ky. 49, 282 S. W. 1061; Carey-Reed Co. v. City of Marion, 231 Ky. 117, 21 S. W. (2d) 145; Dark Tobacco Growers' Association v. Ray, 215 Ky. 373, 285 S. W. 198; Brenard Mfg. Co. v. Hager, 218 Ky. 352, 291 S. W. 355. In Irwin v. Westwood Real Estate & Development Co., 200 Ky. 760, 255 S. W. 546, 547, it is said:

> "In order, however, to obtain the relief, the proof of the mutual mistake or fraud must be clear and convincing, since its purpose is to overcome the agreement as expressed in the writing. But the 'clear and convincing proof' required before the relief will be given is not confined alone to the express statements of witnesses, but may also be developed by 'the character of the testimony, the coherency of the entire case, the documents, circumstances and facts which are proven.'"

We have not attempted to detail all the evidence, but it may be said from correspondence, between counsel for the respective parties appearing in the record and other facts and circumstances, some of which have not been detailed, it is apparent that counsel for the respective parties acted in the utmost good faith, and their dealings were open and above board. Appellant has not only failed to establish fraud by clear and convinc-

ing evidence, but there is little if anything from which even a remote inference of fraud might arise, and, this is true without taking into consideration the evidence of Mr. Rankin to which objection is made. On the record as a whole, considering the character of the testimony, the facts and circumstances in proof, and all reasonable inferences that may be drawn therefrom, the conclusion is inescapable that the chancellor did not err in his finding.

Wherefore the judgment is affirmed.